**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **JO LINDA LAWSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 08-CV-04052-JAR-KGS** |
| **v.** | ) | |
| | ) | |
| **JOHN E. POTTER,** | ) | |
| **Postmaster General of the** | ) | |
| **United States Postal Service,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

<u>**MEMORANDUM AND ORDER**</u>

Plaintiff Jo Linda Lawson filed suit against her employer, defendant John E. Potter,

Postmaster General of the United States Postal Service ("USPS"), alleging that USPS (1)

retaliated against her for reporting alleged discrimination, and (2) created a retaliatory hostile

work environment in response to plaintiff's complaints to the Equal Employment Opportunity

Commission, both in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42

U.S.C. § 2000e *et seq.* This matter comes before the Court on defendant's Motion for Summary

Judgment (Doc. 44). For the reasons explained in detail below, the Court grants defendant's

motion for summary judgment.

**I.        Summary Judgment Standard**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law."[1]  A fact is only material under

---

[1] Fed. R. Civ. P. 56(c)(2).

this standard if a dispute over it would affect the outcome of the suit.[2]  An issue is only genuine if it "is such that a reasonable jury could return a verdict for the nonmoving party."[3]  The inquiry essentially determines if there is a need for trial, or whether the evidence "is so one-sided that one party must prevail as a matter of law."[4]

The moving party bears the initial burden of providing the court with the basis for the motion and identifying those portions of the record that show the absence of a genuine issue of material fact.[5]  "[A] movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim."[6]  The burden may be met "simply by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."[7]  If this initial burden is met, the nonmovant must then "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[8]  The nonmovant may support its claims with affidavits, depositions, or answers to interrogatories.[9]  In limited circumstances, a verified complaint may be treated as an

---

[2]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[3]*Id.*

[4]*Id.* at 251–52.

[5]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[6]*Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp.*, 477 U.S. at 325.

[7]*Id.*

[8]*Id.*

[9]Fed. R. Civ. P. 56(e).

affidavit if it meets the requirements for affidavits set out in Rule 56(e).[10]  However, statements

of "mere belief" must be disregarded.[11]  Therefore, the nonmoving party may not simply rest

upon its pleadings to satisfy its burden,[12] and cannot avoid summary judgment by relying on

ignorance of facts or mere suspicions, or by repeating conclusory opinions, allegations

unsupported by specific facts, or speculation.[13]

When examining the underlying facts of the case, the Court is cognizant that all

inferences must be viewed in the light most favorable to the nonmoving party and that it may not

make credibility determinations or weigh the evidence.[14]  However, summary judgment is not a

"disfavored procedural shortcut," rather, it is an important procedure "designed to secure the

just, speedy and inexpensive determination of every action."[15]

## II.    Uncontroverted Facts

### A.    *Evidentiary Objections*

Defendant objects to some of the materials cited by plaintiff in support of her statement

of facts; specifically, defendant objects to: (1) facts supported only by plaintiff's Amended

Complaint, (2) plaintiff's use of her own deposition testimony to discuss statements by Dr.

---

[10]*Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1019 (10th Cir. 2002) (stating that a court may treat a verified complaint "as an affidavit for purposes of summary judgment" if it satisfies the requirements for affidavits set out in Rule 56(e), but is not required to give such leniency if "'the allegations contained in the pleadings are merely conclusory.'") (citations omitted).

[11]*Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1200 (10th Cir. 2006).

[12]*Anderson,* 477 U.S. at 256; *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990); *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[13]*Argo*, 452 F.3d at 1199 (citation omitted); *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

[14]*Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

[15]*Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

Ransom, plaintiff's physician, and (3) plaintiff's use of Exhibit G–an unsigned, handwritten letter entitled "Union Statement."

Although a party may not "rely *merely* on allegations or denials in its own pleading,"[16] in limited circumstances, a verified complaint may be treated as an affidavit if it meets the requirements for affidavits set out in Rule 56(e).[17]  Although plaintiff's Amended Complaint is not signed by plaintiff, in all other respects, it largely complies with Rule 56(e).  Therefore, to the extent plaintiff makes statements of fact in her Amended Complaint that are based on personal knowledge, setting out facts admissible at trial, and regarding matters upon which she is competent to testify, the Court will consider those statements.[18]  However, to the extent plaintiff's statements express mere belief or feeling, or are conclusory only, they will be disregarded.[19]

When deciding a summary judgment motion, the Court may consider evidence submitted, if admissible in substance, even if it would not be admissible in form, at the trial.[20]  The Tenth Circuit has explained,

> Parties may, for example, submit affidavits in support of summary judgment, despite the fact that affidavits are often inadmissible at trial as hearsay, on the theory that the evidence may ultimately be

---

[16]Fed. R. Civ. P. 56(e)(2) (emphasis added); *Conaway*, 853 F.2d at 792 (noting that plaintiff did not "rely solely on the 'mere' pleadings to oppose the motion for summary judgment").

[17]*Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1019 (10th Cir. 2002); *Conaway*, 853 F.2d at 792 (collecting cases).

[18]Fed. R. Civ. P. 56(e)(1).

[19]*Anderson v. Wintco, Inc.*, 314 F. App'x 135, at 140 (10th Cir. 2009) ("unsupported conclusory allegations do not create a genuine issue of fact"); *Argo v. Blue Cross Blue Shield*, 452 F.3d 1193, 1200 (10th Cir. 2006); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 674 (10th Cir. 1998) ("Vague, conclusory statements do not suffice to create a genuine issue of material fact.").

[20]*Argo*, 452 F.3d at 1199.

presented at trial in an admissible form. Nonetheless, "the content or substance of the evidence must be admissible." Thus, for example, at summary judgment courts should disregard inadmissible hearsay statements *contained* in affidavits, as those statements could not be presented at trial in any form. The requirement that the substance of the evidence must be admissible is not only explicit in Rule 56, which provides that "[s]upporting and opposing affidavits shall . . . set forth such facts as would be admissible in evidence," Fed. R. Civ. P. 56(e), but also implicit in the court's role at the summary judgment stage. To determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury.[21]

Therefore, statements by Dr. Ransom, introduced through plaintiff's deposition testimony, constitute hearsay and will not be considered by the Court on summary judgment.

If documents are attached to a motion for summary judgment but are not properly authenticated, they are not "admissible at trial" and may not be considered.[22] In determining whether a document is admissible, the court must analyze it under Fed. R. Evid. 901(a),[23] which

---

[21]*Id.* (quoting *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 485 (10th Cir. 1995); Fed. R. Civ. P. 56(e)) (citations omitted).

[22]*Bell v. City of Topeka, Kansas*, 496 F. Supp. 2d 1182, 1184–85 (D. Kan. 2007) (quoting *In re Harris*, 209 B.R. 990, 996 (10th Cir. BAP 1997)). In *In re Harris*, the court explained,

> Unauthenticated documents, once challenged, cannot be considered by a court in determining a summary judgment motion. In order for documents not yet part of the court record to be considered by a court in support of or in opposition to a summary judgment motion they must meet a two-prong test: (1) the document must be attached to and authenticated by an affidavit which conforms to rule 56(e); and (2) the affiant must be a competent witness through whom the document can be received into evidence . . . . Documentary evidence for which a proper foundation has not been laid cannot support a summary judgment motion, even if the documents in question are highly probative of a central and essential issue in the case.

*In re Harris*, 209 B.R. at 996 (quoting 11 James Wm. Moore, et al., Moore's 2d 1186, 1196 *Federal Practice* §§ 56.10[4][c][i], 56.14[2][c] (3d ed. 1997)).

[23]*See Law Co. v. Mohawk Constr. & Supply Co.*, 577 F.3d 1164, 1170 (10th Cir. 2009).

states that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Here, the letter entitled "Union Statement," attached to plaintiff's Response as Exhibit G, is an unsigned, handwritten letter on plain paper. Because plaintiff has not directed the Court to any testimony or affidavit that would support a finding that the letter is what plaintiff purports it to be, the Court finds that the unauthenticated, handwritten note is inadmissible under Fed. R. Evid. 901.

Finally, to the extent defendant cites to a previous district court opinion, *Lawson v. Potter*, Case No. 05-2420-KHV, December 4, 2006, to support facts about Lawson's employment history, the Court disregards those facts as unsupported. Defendant is expected to provide a record to this Court in support of the facts in the present case.[24]

### B.    *Undisputed Facts*

The following facts are either uncontroverted, stipulated to, or taken in the light most favorable to the plaintiff. The United States Postal Service is an independent establishment of the government of the United States. Lawson began working at the United States Postal Service ("USPS") in 1994, and became a regular, full-time City Letter Carrier at the Ottawa, Kansas U.S. Post Office in August 2001. Janice Rake began working at the Ottawa, Kansas U.S. Post Office as the Officer in Charge in 2001. She became postmaster of the Ottawa office in 2002.

Lawson's duties and responsibilities as a regular City Letter Carrier included driving a Postal Service vehicle; sorting all classes of mail in sequence of delivery into the carrier case; withdrawing mail from clerk distribution cases and mail containers; sorting mail to be

---

[24]*See* Fed. R. Civ. P. 56(c)(2) (allowing parties to support a motion for summary judgment with pleadings, discovery and disclosure materials on file in the present case, and any affidavits).

forwarded; placing return or mis-thrown mail in a designated throwback case to be processed by clerks; pulling down mail out of the carrier case in sequence into bundles; loading and unloading the mail into the vehicle; delivering all classes of mail on foot or by vehicle under varying conditions; collecting outgoing mail from boxes; delivering accountable mail such as postage-due mail and items requiring a signature; performing scanning tasks with a hand held scanner; performing routine maintenance such as case labels and route address data base updates; and maintaining pleasant and efficient public relations with route customers and others.[25]  When sorting mail into the carrier case, the postal employee uses a method called "casing": he or she holds two to three inches of letter mail in the left hand, or four to six inches of flats on the left arm, and sorts the mail into the carrier case with the right hand.

USPS Letter Carriers are required to obey the instructions of their postal manager so long as the manager is not asking them to do any kind of criminal act.  USPS employees may be subject to discipline for violating the terms and conditions of their employment.  USPS has a progressive discipline policy.  Many employee issues are resolved through informal job discussions, which are not included in an employee's personnel folder and do not serve as a basis for subsequent disciplinary action.  Formal discipline, however, takes the following progression: (1) a Letter of Warning, (2) a Seven-Day Suspension, (3) a Fourteen-Day Suspension, and finally, (4) the employee may be subject to removal.  The discipline is dependent upon the nature and severity of the employee's acts or failure to act.

### Lawson's Discipline History

---

[25]This is not a comprehensive list.  Although plaintiff provided a more thorough description of her job responsibilities, the Court was unable to decipher the small-print document.  Nevertheless, plaintiff does not dispute the description provided above.

Lawson states that, in the first seven years of her employment with the United States Postal Service (1994–2000), her supervisors did not take any disciplinary action against her.[26] Prior to working at the Ottawa, Kansas postal facility, Lawson worked as a part-time flexible employee at other U.S. Post Office locations. She claims she was not reprimanded *or* disciplined at those locations.[27] Lawson received no formal discipline at the Ottawa Post Office before Postmaster Rake became the Officer-in-Charge,[28] or before Lawson filed any complaints with the Equal Employment Opportunity Commission ("EEO").[29]

Between March 14, 2001 and January 28, 2008, under the management of Rake, Lawson was disciplined ninety-four times, either formally or informally, verbally or in writing, for deficiencies in her job performance. Most of these incidents were informal discipline, which, under USPS policy, are not included in Lawson's personnel file and are not used as a basis for determining subsequent disciplinary action. Lawson specifically notes that she was informally disciplined on March 14, 2001; March 28, 2001; February 16, 2005; and February 13, 2007. While an employee at the Ottawa, Kansas postal facility, Lawson was subject to the following *formal* discipline:

(1) a Letter of Warning for Failure to Follow Instructions (November 8,

---

[26]Defendant notes that plaintiff has cited to her Amended Complaint. Although the Complaint is not verified, plaintiff makes this statement on the basis of personal knowledge regarding a matter on which she is competent to testify. *See Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1019 (10th Cir. 2002). Because defendant has not produced any evidence that would controvert plaintiff's allegation that she was never disciplined prior to 2001, the fact remains uncontroverted at this stage.

[27]Plaintiff has not provided any specific information concerning her prior employment.

[28]Defendant argues plaintiff may have been *informally* disciplined prior to Rake's management, but informal discipline is not included in an employee's personnel file, so there would be no evidence to the contrary.

[29]However, the record shows plaintiff was *informally* disciplined multiple times before she filed her first EEO complaint. *See* (Doc. 47, Ex. F, at 14.)

2001);

(2) a 7-Day Suspension for Failure to Follow Instructions/Unacceptable Conduct (January 7, 2002);

(3) a 14-Day Suspension for Failure to Follow Instructions (January 13, 2003);

(4) a 14-Day Suspension for Failure to Follow Instructions (January 29, 2003);

(5) a Long-Term Suspension for Failure to Secure Your Postal Vehicle/Unacceptable Conduct/Unacceptable Performance (November 20, 2004);[30]

(6) a 14-Day Suspension for Failure to Follow Instructions (September 28, 2005); and

(7) a 14-Day Suspension for Failure to Follow Instructions (December 13, 2006).

On April 20, 2007, Lawson received a Notice of Removal for failing to follow instructions and unacceptable conduct.

During Rake's seven-year tenure at the Ottawa Post Office, she disciplined nine other postal workers, either verbally or in writing, in addition to Lawson. The other workers received between one and six disciplinary actions.

### Lawson's EEO Complaints

Between the dates of December 17, 2001 and August 3, 2007, Lawson filed the following formal discrimination complaints during her employment: EEO Complaint No. 4E-640-0020-02 filed December 17, 2001; EEO Complaint No. 4E-640-0017-05 filed February 8, 2005; EEO Complaint No. 4E-640-0066-6 filed April 25, 2006; EEO Complaint No. 4E-640-0016-07 filed February 7, 2007; and EEO Complaint No. 4E-640-0070-07 filed August 3, 2007. Lawson's

---

[30]This was originally a "Notice of Removal," but was reduced to long-term suspension with no back pay.

August 3, 2007 EEO Complaint focused on four incidents: a "snatch" on March 23, 2007; a "grab" on May 2, 2007; a "lecture" on May 8, 2007; and Notice of Removal on April 20, 2007. These incidents are the subject of Lawson's retaliation claims in this lawsuit.

In September 2004, Lawson also filed a sex discrimination and retaliation lawsuit against USPS in the Western District of Missouri. On September 20, 2005, the case was transferred to the District of Kansas. Lawson claimed USPS's management officials disciplined her because of her sex and retaliated against her when they removed her from USPS. The Court sustained USPS's motion for summary judgment and entered a judgment in favor of USPS and against Lawson on her sex discrimination and retaliation claims.

From January 2007 through May 2007, no postal supervisors ever prevented Lawson from filing an EEO complaint or participating in EEO activity while she worked as a Letter Carrier at the Ottawa Post Office. Lawson never heard Rake say anything about Lawson's EEO activity, and Rake stated that she never got angry at Lawson for reporting Rake. Rake considered it her job to deal with employees and try to improve and correct their behavior, and she did not believe anger assisted that goal. Lawson testified that she stopped filing EEO complaints due to the frequency of problems she encountered and the overwhelming time commitment it took to complete EEO paperwork.

### March 23, 2007 – Work Floor Incident

On March 23, 2007, the mail volume was light. Each day, Rake determined the workload of each carrier by a computer-generated printout. Automated equipment at the Post Office physically counted mail by the piece. Any mail that could not be counted by machine was processed manually by the mail clerks, volumes recorded, and pieces calculated per volume for

the respective type of mail. The total count was then used to calculate the workload for each carrier according to the performance each carrier had previously demonstrated on the carrier's assigned route. The portion of a carrier's calculated daily workload that required more than the allotted eight hours per day to complete is considered "overtime." The portion of a carrier's calculated daily workload that required less than the allotted eight hours per day to complete is considered "undertime."

DOIS is a management tool used to determine the workload of each mail carrier based on the mail volume for that day. The program has an established office performance for how fast each carrier sorts mail and performs his or her office duties. The program also has an established street time for each carrier on his or her route. Each day when the mail volume comes in, the automated mail volume for the letters and the flats is downloaded from the machines to the DOIS program. The mail that is sorted by the clerks in the office is measured, entered into the system, and a formula computes the actual workload based on that day's mail volume. The DOIS report instructs Post Office management how close to an eight-hour day a carrier should be able to perform his or her work. The numbers in a DOIS report can be manipulated.

As a USPS Letter Carrier, Lawson was expected to work a full eight-hour workday. Rake knew that Lawson's performance was "very inconsistent," and Lawson frequently completed her work in overtime. On March 23, 2007, Rake determined that Lawson's route and some other carrier's routes showed undertime. Carriers with undertime were expected to do additional work (called "pivots") to fill their eight-hour workday. A "pivot" is created when the manager splits another employee's route and gives portions of the split route to a Letter Carrier to carry in addition to their own route.

On March 23, 2007, Lawson's computer-generated workload showed that she only had enough work to fill a six-hour and forty-three minute workday.[31] The machine-generated numbers indicated that Lawson had one hour and seventeen minutes of undertime. Therefore Rake assigned Lawson a forty-five minute driving pivot off a vacant route. When Rake discussed Lawson's workload and the forty-five minute pivot, Lawson informed Rake that she did not have time for the pivot and probably would need to leave mail unsorted to complete her own route. Lawson was the only carrier with undertime who informed Rake that she did not have time to perform a pivot on March 23, 2007.

Because Lawson claimed she had no undertime, claimed she could not take a pivot, and made an advance request to curtail mail when her workload did not appear to justify it, Rake decided to observe Lawson's office performance. As Lawson's manager, Rake was permitted to observe Lawson performing her duties at any time. On March 23, 2007, Rake observed Lawson for approximately one hour and thirty minutes to one hour and forty-five minutes.

Lawson knew that USPS Letter Carriers are required to hold six inches of flats while casing (sorting mail in sequence into a carrier case). "Flats" are cased items, such as magazines, that are larger than letter size. She had received instruction on how to case flats on multiple occasions prior to March 23, 2007. Lawson received instruction from Rake and from other USPS supervisors to hold four to six inches of flats while casing. In 2006, Lawson attended Letter Carrier training where she received a pamphlet stating, "To the extent possible, case flats holding approximately 50 pieces (6 inches) in the left arm while distributing with the right

_____

[31]Although Lawson indicates that the computer-generated workload may not be accurate, and can even be manipulated, Lawson did not produce any evidence suggesting her performance numbers were manipulated on March 23, 2007, or any other date.

hand." Lawson stated that she probably saw the Ottawa Post Office Standard Operating Policy posted on the union bulletin board, which said, "[g]rab an armful of flats (6 inches) and put up accordingly."

On March 23, 2007, during Rake's observation, Rake noticed Lawson's arm load and, although Rake did not formally measure it, she estimated that Lawson was picking up one-and-a-half to three inches of flats while casing them.[32] Rake instructed Lawson several times to pick up at least four inches and up to six inches of flats while casing them. Lawson responded to Rake's instruction by holding what she believed was "a comfortable amount" of flats. Lawson did not remember whether she ever picked up four to six inches of flats as she was instructed to do.

During Rake's observation, Lawson commented that maybe she (Lawson) should get a breast reduction. Lawson later explained that she made the "breast reduction" comment because Rake wanted Lawson to hold four to six inches of mail, which Lawson believed would cause the mail to hit against her breast while she was casing. Rake told Lawson that the breast reduction comment was unacceptable in the workplace.

According to the computer-generated report, on March 23, 2007, Lawson began her workday with one hour and seventeen minutes of undertime, which meant she did not have enough work to fill an eight-hour workday. However, by the end of Lawson's workday, she had

---

[32]Lawson did not remember the amount of flats she picked up on that date, but she did not believe it was as little as one to one-and-a-half inches. Neither Lawson nor Rake ever measured the amount of flats in Lawson's arms on March 23, 2007. Rake made an estimate based on her judgment and experience. Lawson has not controverted this fact. Rather, Lawson stated she did not recall the precise amount she held. At the office meeting later that day, Lawson asserted that she was physically unable to pick up six inches of flats, thereby expressing that she had no intent of doing so. The nonmoving party cannot create a genuine issue of material fact by relying on ignorance of facts or mere suspicions. *See Argo*, 452 F.3d at 1199 (citation omitted); *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

accumulated fifty-one minutes of unauthorized overtime.

Pursuant to USPS's progressive discipline policy, the level of discipline Lawson received on April 20, 2007 was based on her prior discipline history. In a letter dated April 20, 2007, and entitled "Notice of Removal," plaintiff was charged with "[f]ailing to follow instructions," and Rake noted the following deficiency:

> On March 23, 2007, you were observed practicing time wasting. I instructed you several times on this day to hold 4 to 6 inches of flats in your arm while casing. I reminded you that the M-41 and the local SOP called for 6 inches. You said it was not comfortable and never did hold more than 1 ½ - 3 inches. You argued that your training said to hold a comfortable amount, but also acknowledged that they said to follow the supervisor's instructions as well as the local SOP. You then said you had a bad back and I responded by pointing out that you did not have medical restrictions that would restrict you from holding flats on your arm. Your failure to follow instructions by not having efficient work practices resulted in delayed mail delivery.

In the same letter, Rake included a second charge for "[u]nacceptable [c]onduct," finding as follows:

> While holding the mail on your arm, you also made an inappropriate statement that you "needed to get a breast reduction." You made this same comment during my last observation and were told at that time that it was inappropriate. This conduct is unacceptable and inappropriate on the workroom floor.

Lawson filed a grievance regarding her April 20, 2007 Notice of Removal.

### March 23, 2007 – "Snatch" Incident

During Rake's March 23, 2007 observation, she instructed Lawson to case a small amount of flats that were on the floor, which Rake estimated would take three minutes to complete. Rake then picked up the flats from the floor and placed them on Lawson's ledge. In

response, Lawson began casing the flats, then she asked, "Is it a contract violation for you to load my ledge?"  Rake responded to the comment by removing the remaining flats from the ledge and the remaining flats from Lawson's arm.  Rake placed all the flats back on the floor. Lawson claims Rake removed the flats from her arms by snatching them.

### May 2, 2007 – "Grab" Incident

Lawson filed a grievance regarding her April 20, 2007 Notice of Removal.  Because Lawson grieved her removal, Rake, as her manager, was required to discuss the grievance with Lawson to determine if it could be informally resolved.  This discussion is called the Informal Step A grievance meeting.  On May 2, 2007, Lawson, Rake, Brian Simon (Lawson's Union Representative), and Supervisor ShanRica Goines were present for Lawson's mandatory Informal Step A grievance meeting.  Nothing obstructed the view of anyone present at the meeting.  Lawson brought a tape measure to the meeting to show the participants that it was impossible for her to hold six inches of flats.  During her demonstration, she held her arm at an upward angle, as if to keep the flats from slipping off her arm.  Rake then reached across the table and adjusted Lawson's arm downward to demonstrate that Lawson could hold four to six inches of flats.[33]  Lawson claims Rake "forcibly grabbed" her arm "by the wrist without her request or consent."  Rake, Simon, and Goines each prepared a short written statement, noting that they saw Rake "touch" Lawson's arm at the meeting.  Lawson reported the incident to the Police Department but was told it was not something they handled.

_____

[33]The parties dispute whether Rake said anything at the time she "touched" Lawson's arm, whether Lawson consented to Rake's touch, or whether Lawson asked Rake to demonstrate how Lawson might be able to hold more mail flats.  These particular facts are immaterial.  It is clear that Lawson sought to demonstrate she could *not* hold six inches of flats, and Rake sought to adjust Lawson's arm for the purpose of showing Lawson that she *could* hold more flats.

**May 8, 2007 – "Lecture" Incident**

On May 7, 2007, Lawson returned to the office when Rake was the only supervisor present. Lawson was alone with Rake, and Rake looked at Lawson. Lawson testified that Rake's mere presence made her feel uncomfortable and unsafe. The next day, on May 8, 2007, Lawson approached her supervisor, ShanRica Goines, on the workroom floor to express concern about being left alone with Rake the night before. Lawson informed Goines that she was not comfortable being alone with Rake, and informed Goines that, as Lawson's supervisor, Goines was responsible for keeping the workplace safe for Lawson.

Later that day, Supervisor Goines held a job discussion in her office with Lawson and Brian Simon, regarding the manner in which Lawson confronted Goines earlier that day. Supervisor Goines told Lawson she should not tell Goines how to do Goines's job. Goines informed Lawson not to talk to her at the mailcase about Lawson's concerns, and advised Lawson that she should have stopped at Goines's desk and they would have taken the discussion to the office. Goines told Lawson to do her job and Goines would take responsibility for her (Goines's) job. Lawson described the May 8, 2007 incident as a lecture.[34]

At the end of May 2007, Rake left the Ottawa office to go on a vacation. Upon her return, she went on a detail where she stayed until she retired. New management took over at the Ottawa U.S. Post Office. In June 2007, Lawson signed a "Last Clear Chance" agreement with the Union that specified she could be terminated from her employment if she received any

---

[34]In her Response, plaintiff added that "Supervisor Goines intimidated and verbally assaulted Lawson by lecturing her on her lack of professionalism." The Court disregards these conclusory statements, as plaintiff has not cited to any factual support, or explanation, for her legal conclusions. Furthermore, plaintiff's Amended Complaint (cited in support of this statement) merely states that she "*felt* intimidated and verbally assaulted." (Doc. 47, Ex. D, at ¶ 19) (emphasis added).

discipline for failing to follow instructions from June 2007 through June 2009. Lawson has received no formal discipline since June 2007.

## III. Discussion

Lawson alleges she was retaliated against because of her EEO complaints. She states that she felt singled-out by Rake for discipline and negative attention; was "fearful of and intimidated by" Rake; and felt Rake's expectations of her were not the same as for other letter carriers. She believes she was subjected to negative treatment regarding instruction on carrying six inches of mail and pivot assignments; she felt Rake manipulated her DOIS report numbers to make Lawson's performance inaccurate and her workload more burdensome; and she felt Rake micro-managed her activities, causing Lawson stress that impeded her ability to perform her job.

### A. Claim Preclusion

Defendant has raised the defense of claim preclusion to part of plaintiff's claims. Plaintiff has asked this Court to consider various incidents of formal and informal discipline for two purposes: (1) as evidence of *pretext* in support of her retaliation claim, and (2) as evidence of *harassment* in support of her retaliatory hostile work environment claim. Defendant asserts that, under the doctrine of claim preclusion, plaintiff cannot re-litigate incidents of discipline previously litigated in *Lawson v. Potter*.[35]

Claim preclusion applies to bar the maintenance of a subsequent suit where the following three requirements are present: "(1) identity or privity of the parties; (2) identity of the cause of action; and (3) a final judgment on the merits."[36] Plaintiff's first lawsuit alleged sex

---

[35]463 F. Supp. 2d 1270 (D. Kan. 2006).

[36]*Heard v. Bd. of Pub. Utilities for the City of Kan. City, Kan.*, 316 F. Supp. 2d 980, 982 (D. Kan. 2004).

17

discrimination and retaliation claims against John Potter, alleging Janice Rake and other supervisors disciplined Lawson on various occasions between August 2001 and November 2004.[37]  To the extent plaintiff is presently alluding to disciplinary action instituted by Rake against Jo Linda Lawson, between August 2001 and November 2004, in support of her present retaliation claim, the Court finds that it is the same claim, based on the same factual allegations, against the same party, and has already been adjudicated on the merits.  A retaliation claim based on these disciplinary incidents cannot be reconsidered by this Court in support of plaintiff's present retaliation claim.  Nevertheless, as developed more fully below, even if the Court considers all ninety-four incidents of disciplinary action over a seven-year period, plaintiff still has not met her burden on her claim for retaliation.

Next, defendant argues that claim preclusion bars any consideration of discipline prior to November 2004 in support of plaintiff's claim for retaliatory hostile work environment.  Although plaintiff asserted a *retaliation* claim in her earlier lawsuit, she is presently asserting a claim for "retaliatory hostile work environment," which was not presented in the earlier case.  Unlike a retaliation claim, which focuses on discrete incidents, a hostile work environment claim requires a court to consider evidence of general work atmosphere as well as specific instances of hostility.[38]  Plaintiff's earlier retaliation claim appears to have been focused on the period from August 2001 until November 2004.  Plaintiff's present retaliatory hostile work environment

---

[37]*See Lawson v. Potter*, 463 F. Supp. 2d 1270 (D. Kan. 2006).

[38]*Schweitzer-Reschke v. Avnet, Inc.*, 874 F. Supp. 1187, 1193 (D. Kan. 1995); *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) ("Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. . . . The 'unlawful employment practice' therefore cannot be said to occur on any particular day.  It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. . . . Such claims are based on the cumulative effect of individual acts.").

claim focuses on the period up to 2007.[39]  Because the Court must consider general work

atmosphere, as well as specific incidents of harassment, evidence of interactions between

Lawson and her supervisors prior to 2004 is relevant background evidence for her present

claim.[40] Therefore, claim preclusion does not bar plaintiff's claim for retaliatory hostile work

environment, or prevent this Court from considering discipline initiated against plaintiff prior to

November 2004 as background evidence of "work environment" in support of her hostile work

environment claim.

### B.    Retaliation

Title VII makes it unlawful for an employer to discriminate against an employee because

"[she] has opposed any practice made an unlawful employment practice" or because "[she] has

made a charge, testified, assisted, or participated in any manner in an investigation, proceeding,

or hearing" under Title VII.[41]  In the absence of direct evidence, Title VII retaliation claims are

subject to the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*.[42]  Under this

analysis, plaintiff bears the initial burden of establishing a prima facie case of retaliation.[43]  If

---

[39]Although claim preclusion "prevents the parties or their privies from relitigating issues that were or could have been raised in an earlier action," it does "not necessarily bar plaintiff from litigating claims based on conduct that occurred after the initial complaint was filed."  *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1202 (10th Cir. 2000) (internal quotation marks omitted).

[40]*See Heard*, 316 F. Supp. 2d at 983–84 (noting that the time periods covered by the two claims did not completely overlap: "In the Second Lawsuit, plaintiff claimed that the alleged discriminatory conduct occurred on or about May 2001.  In the instant case, plaintiff alleges discriminatory conduct occurring from November 3, 1997, with no ending date certain.  As such, the period of alleged discriminatory conduct in the Second Lawsuit does not necessarily subsume the allegations of discrimination alleged in this suit.").

[41]42 U.S.C. § 2000e-3(a).

[42]411 U.S. 792, 802–04 (1973); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 260 (1981); *Vaughn v. Epworth Villa*, 537 F.3d 1147, 1150 (10th Cir. 2008).

[43]*Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1170 (10th Cir. 2006).

plaintiff establishes a prima facie case, the burden of production shifts to the defendant to proffer a legitimate, non-retaliatory reason for the employment action.[44]  The burden then shifts back to the plaintiff to demonstrate that the defendant's proffered reason is pretextual.[45]

### 1. Prima Facie Case

To state a prima facie case of retaliation, plaintiff must show that: (1) she engaged in a protected activity; (2) defendant took an action that a reasonable employee would have found materially adverse; and (3) there exists a causal connection between the protected activity and the materially adverse action.[46]  There is no dispute that plaintiff engaged in protected activity when she filed her five EEO complaints and two federal lawsuits.  Defendant argues, however, that plaintiff cannot show that defendant's conduct toward plaintiff was materially adverse or that it was causally related to her protected activity.  Thus, the Court will address whether plaintiff has met the second and third elements of a prima facie case.

### (a). *Materially Adverse to a Reasonable Employee*

"A challenged employment action is *adverse* for the purposes of a claim for retaliation under Title VII if 'a reasonable employee would have found [it] *materially* adverse,'"[47] that is, the actions are "'harmful to the point that they could well dissuade a reasonable worker from

---

[44]*Id.*

[45]*Id.*; *see also Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1263 (10th Cir. 1998) (explaining that plaintiff has the ultimate burden of demonstrating that the challenged employment decision was the result of intentional retaliation).

[46]*Metzler*, 464 F.3d at 1171.

[47]*McGowan v. City of Eufala*, 472 F.3d 736, 742 (10th Cir. 2006) (quoting *Mickelson v. New York Life Ins. Co.*, 460 F.3d 1304, 1315 (10th Cir. 2006)) (emphasis added).

making or supporting a charge of discrimination.'"[48] "This standard focuses on the employer's retaliatory action, not the underlying discrimination the employee had opposed."[49] Although the standard is "sensitive to the particular circumstances of each case, it prescribes an objective inquiry that does not turn on a plaintiff's personal feelings about those circumstances."[50] The Court must focus on "materially adverse" actions "in order to separate trivial harms from actionable injuries because Title VII does not establish 'a general civility code for the American workplace.'"[51] Therefore, the Court is to evaluate the case "from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances."[52] "[T]he fact that an employee continues to be undeterred in his or her pursuit of a remedy . . . may shed light as to whether the actions are sufficiently material and adverse to be actionable."[53]

The Tenth Circuit has found that "the 'prospect of losing wages, benefits, and ultimately a job' would dissuade a reasonable worker from supporting a charge of discrimination."[54] A Title VII retaliation claim does not require a "materially adverse" action, but merely an action that a reasonable employee would consider materially adverse.[55] Nevertheless, the Tenth

---

[48]*Semsroth v. City of Wichita*, 555 F.3d 1182, 1184 (10th Cir. 2009) (quoting *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 57 (2006)) (emphasis added).

[49]*Id.* (citing *Burlington*, 548 U.S. at 69–70).

[50]*Id.* (internal citations omitted).

[51]*Somoza v. Univ. of Denver*, 513 F.3d 1206, 1212 (10th Cir. 2008); *see also Burlington*, 548 U.S. at 68 (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998)).

[52]*Somoza*, 513 F.3d at 1212 (quoting *Burlington*, 548 U.S. at 71).

[53]*Id.* at 1214.

[54]*McGowan v. City of Eufala*, 472 F.3d 736, 742 (10th Cir. 2006) (quoting *Mickelson v. N.Y. Life Ins. Co.*, 460 F.3d 1304, 1316 (10th Cir. 2006)).

[55]*Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1171 n.2 (10th Cir. 2006).

Circuit's precedent on "materially adverse" employment actions is instructive here. A materially adverse action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different [job] responsibilities, or a decision causing a significant change in benefits."[56] Even a written reprimand is "materially adverse" if it makes it more likely that a complaining employee could be fired,[57] or will affect the plaintiff's future employment opportunities.[58] On the other hand, "a mere inconvenience or an alteration of job responsibilities" is not an adverse employment action.[59] In determining whether a particular action is materially adverse to a *reasonable employee*, the Tenth Circuit applies a case-by-case approach, giving careful attention to context.[60] Normally, "'petty slights, minor annoyances, and simple lack of good manners' will not deter 'a reasonable worker from making or supporting a charge of discrimination.'"[61]

Plaintiff identifies three specific interactions with her supervisors that she believes were materially adverse: (1) "Postmaster Rake's snatching mail from Lawson's arm on March 23, 2007"; (2) Postmaster Rake's "hostility and aggression toward Lawson when she grabbed Lawson's arm without consent" on May 2, 2007; and (3) "Supervisor ShanRica Goines' public reprimand of Lawson on May 8, 2007."[62] The acts plaintiff contends were retaliatory, when

---

[56]*Id.* (quoting *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1217 (10th Cir. 2003)).

[57]*Id.* (citing *Roberts v. Roadway Express*, 149 F.3d 1098, 1104 (10th Cir. 1998)).

[58]*Medina v. Income Support Div., N.M.*, 413 F.3d 1131, 1137 (10th Cir. 2005).

[59]*Lombardo v. Potter*, 368 F. Supp. 2d 1178, 1194 (D. Kan. 2005) (quoting *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998)).

[60]*McGowan v. City of Eufala*, 472 F.3d 736, 742 (10th Cir. 2006).

[61]*Id.* at 742 (quoting *Burlington*, 548 U.S. at 68).

[62](Doc. 47 at 12.)

considered either individually or in the aggregate, were not likely to dissuade a reasonable employee from engaging in protected activity.

Under the totality of the circumstances, the Court is unable to find that a reasonable person would have found the "snatch" to be materially adverse. Plaintiff questioned Rake's authority to move plaintiff's workload from the floor onto her ledge; in response to plaintiff's suggestion that Rake's assistance was a breach of contract, Rake took the flats from plaintiff's arms and returned them to the ground. Rake's actions were in response to plaintiff's comment. When considered in context, Rake's action of forcibly removing the flats from Lawson's arm does not meet the objective standard of materially adverse. Plaintiff has not alleged that she was physically injured by the incident; she merely found it offensive. The incident did not result in an adverse change in her employment status, let alone a *materially* adverse change, and it had no apparent effect on her future employment prospects.

Although the parties dispute the amount of force Rake used when she "grabbed" Lawson's arm at the Step A meeting, the Court cannot find it materially adverse to an objective person in plaintiff's position. Plaintiff and Rake were in a formal Step A meeting, wherein they were joined by ShanRica Goines and her union steward, Brian Simons. Plaintiff brought a tape measure to the meeting for the express purpose of demonstrating how many flats she believed she could hold on her arm at one time. It is uncontroverted that Rake reached for plaintiff's arm to demonstrate that plaintiff could hold more flats than she was demonstrating. Although plaintiff found it rude, plaintiff has not alleged any physical injury. All other witnesses in the meeting stated that Rake merely "touched" plaintiff's arm. When considered in context, the Court cannot conclude that Rake's action would be a deterrent to a reasonable person engaged in

protected activity.

Finally, the "lecture" plaintiff received does not meet an objective standard either. ShanRica Goines spoke with Lawson in the privacy of Goines's office, and the meeting was arranged in response to comments plaintiff made to Goines earlier that day on the workroom floor. The meeting occurred in the presence of Brian Simons, plaintiff's union representative. Although Goines was apparently critical of plaintiff's conduct, and plaintiff was emotionally upset by the meeting, plaintiff does not allege that it affected her employment conditions. No record of the meeting was included in her personnel file and the Court finds that a reasonable person would not find it *materially* adverse.

As defendant notes, plaintiff was not dissuaded from participating in EEO activity after these three incidents took place. On August 3, 2007, following the three incidents, plaintiff filed yet another EEO complaint. Furthermore, a reasonable person would not have been dissuaded either. The March 23, 2007 "snatch" by Rake was a response to plaintiff's remarks; the May 2, 2007 "grab" occurred more than a month later, in response to plaintiff's physical demonstration in a private meeting; and the May 8, 2007 "lecture" by Goines occurred in the privacy of Goines's office with union representative Brian Simon present. The Court is unable to conclude that a reasonable person would cease all protected Title VII activity in response to these incidents.

Finally, defendant concedes that the April 20, 2007 Notice of Removal was materially adverse. A record would be included in her personnel folder for future consideration. It would likely deter a reasonable employee from engaging in protected activity.

### (b).    *Causally Related*

To establish the third element of a prima facie case of retaliation, plaintiff must show a causal connection between her protected EEO activity and defendant's Notice of Removal.[63] The "critical inquiry" at this prima facie stage is "whether the plaintiff has demonstrated that the [employer's] action occurred under circumstances which give rise to an inference of unlawful discrimination."[64] "If the reason for the claimed adverse action does not flow from a discriminatory motive, it lacks the requisite causal connection to the adverse action."[65] Close temporal proximity between plaintiff's protected activity and the employer's adverse employment action may create an inference of retaliatory motive,[66] however, a plaintiff may rely on temporal proximity alone only if "the termination is *very closely* connected in time to the protected activity."[67] The Tenth Circuit has found that six weeks gives rise to a presumption of causation, but three months does not.[68]

Here, plaintiff asserts that the close temporal proximity between Lawson's filing of EEO complaints and the Post Office's disciplinary action was sufficient to establish an inference of causation. Although plaintiff alleges that "[i]n one instance, less than a week passed" between filing an EEO complaint and defendant's disciplinary action, she leaves it to the Court to

---

[63]*Metzle*r, 464 F.3d at 1171.

[64]*Id.* (citing *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1221 (10th Cir. 2002) (quotations omitted)).

[65]*McGowan v. City of Eufala*, 472 F.3d 736, 747 (10th Cir. 2006).

[66]*Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1066 (10th Cir. 2009). Although the Tenth Circuit found temporal proximity relevant in determining whether plaintiff had established a prima facie case, the Court stated that, standing alone, temporal proximity is *not* sufficient to demonstrate *pretext* under the third prong of the *McConnell-Douglas* framework. *Id.* at 1066 n.7.

[67]*Metzler*, 464 F.3d at 1171 (quoting *Anderson v. Coors Brewing*, 181 F.3d 1171, 1179 (10th Cir. 1999) (emphasis in original)).

[68]*Anderson*, 181 F.3d at 1179.

determine which EEO complaint allegedly triggered which disciplinary action. Assuming plaintiff is alluding to the actions she identified as "materially adverse" and "retaliatory," she alleges she was subject to "materially adverse" discipline on March 23, 2007, May 2, 2007, May 8, 2007, and April 20, 2007. The Court notes that plaintiff filed EEO complaints on February 7, 2007 and on August 3, 2007. To the extent plaintiff is demonstrating that she was disciplined on April 20, 2007, less than three months after she filed the February 7, 2007 complaint, it is sufficiently distanced to fall short of a causal inference. At this point, however, the Court will assume without deciding that she has shown a sufficiently close temporal relationship to raise an inference that the two incidents were causally related.[69] The Court re-iterates that the "snatch" on March 23, the "grab" on May 2, and the "reprimand" on May 8 in Goines' office were not materially adverse employment actions sufficient to deter a reasonable person from filing a charge. In fact, plaintiff filed another EEO complaint on August 3, 2007, not long thereafter.

Plaintiff also appears to allude to the temporal proximity between her EEO complaints and specific incidents of *informal* discipline. Plaintiff notes that she filed an EEO complaint on February 8, 2005, and was informally disciplined on February 16, 2005; she filed an EEO complaint on February 7, 2007, and was informally disciplined on February 13, 2007. Although the events are *very close* temporally, plaintiff provides absolutely no facts about either disciplinary incident to show that it was materially adverse. In fact, the record only indicates that these disciplinary interactions involved "discussions" or "instructions." The Court notes that plaintiff cannot allege "materially adverse" by focusing on one set of events (a "snatch," "grab," and "lecture") and then establish "causation" by focusing on a completely different set of

---

[69] *See id.* at 1179 (assuming, without deciding, that two months and one week was sufficiently close to raise an inference of causation).

unsubstantiated interactions. Plaintiff has failed to establish a prima facie case of retaliation on the basis of these informal interactions.

Nevertheless, assuming the April 20, 2007 Notice of Removal was materially adverse and sufficiently close in time to plaintiff's February 7, 2007 EEO Complaint to establish a prima facie case of retaliation, the Court will consider defendant's proffered reason for the action.

## 2. Legitimate, Nonretaliatory Reason for Discipline

Assuming, *arguendo*, that plaintiff would be able to establish a prima facie case of retaliation, the burden under *McDonnell Douglas* shifts to defendant to demonstrate a legitimate, non-retaliatory reason for its discipline decision.[70] Defendant asserts that the level of discipline issued to Lawson in the April 20, 2007 Notice of Removal was based on her prior disciplinary history and was in conformity with USPS's progressive discipline policy. Defendant states that, based on plaintiff's prior discipline record, plaintiff's March 23, 2007 work-related deficiencies warranted more severe sanctions. On March 23, 2007, plaintiff knew–through training, office postings, and instructions from supervisors–that she was required to hold four to six inches of flats while casing, and was repeatedly instructed to do so by Rake. In response to Rake's instructions, plaintiff chose to hold merely a "comfortable amount," which Rake never considered to meet standards. Plaintiff does not allege that a "comfortable amount" was four to six inches of flats. Rather, plaintiff commented that she would need a "breast reduction" before she could physically hold four to six inches of flats. Rake informed plaintiff that her comments were inappropriate. The Notice of Removal was issued thereafter and set out the facts upon which it was based. The Court finds that defendant has articulated a legitimate, non-retaliatory

---

[70]*See, e.g., Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1135 (10th Cir. 2003).

reason for issuing a Notice of Removal to plaintiff on April 20, 2007.

### 3.     Pretext

Even if plaintiff would be able to establish a *prima facie* case of retaliation, the Court finds no genuine issue of material fact on the issue of pretext.  To defeat summary judgment, plaintiff must show that there is a genuine dispute of material fact as to whether defendant's explanations for its disciplinary action were pretextual.[71]  To raise a fact issue of pretext, plaintiff must present evidence of temporal proximity plus circumstantial evidence of retaliatory motive.[72] At this stage of the analysis, "temporal proximity alone is not sufficient to defeat summary judgment."[73]  A plaintiff can show pretext by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."[74] While this burden is "'not onerous,' . . . it is also 'not empty or perfunctory.'"[75]

A plaintiff typically makes a showing of pretext in one of three ways: (1) evidence that defendant's stated reason for the adverse employment action was false, *i.e.*, unworthy of belief; (2) evidence that defendant acted contrary to a written company policy prescribing the action to be taken under the circumstances; or (3) evidence that defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting

---

[71]*Mickelson v. N.Y. Life Ins. Co.*, 460 F.3d 1304, 1318 (10th Cir. 2006).

[72]*Pastran v. K-Mart Corp.*, 210 F.3d 1201, 1206–07 (10th Cir. 2000).

[73]*Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1066 (10th Cir. 2009) (citing *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1240 (10th Cir. 2004); *Pastran*, 210 F.3d at 1206).

[74]*Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quotations omitted).

[75]*Id.* at 1323–24.

plaintiff.[76]  In addition, evidence of pretext may include whether plaintiff was treated differently from similarly-situated employees.[77]

Here, plaintiff asserts that she was not disciplined *before* or *after* Rake worked at the Ottawa postal facility.  Yet, during Rake's supervision, plaintiff was disciplined ninety-four times while other employees under Rake's supervision were disciplined, at most, six times. Plaintiff argues that this raises an inference of retaliation.

### *(a).*   *Comparison with Prior and Subsequent Supervisors*

First, plaintiff's comparison between her disciplinary record *before* Postmaster Rake, *during* Postmaster Rake, and *after* Postmaster Rake is insufficient to create an inference of retaliation.  Pretext cannot be inferred from different treatment instituted by different supervisors, in part, because any difference in treatment may be the result of different supervisors' reactions to different standards of behavior and performance.[78]  Thus, plaintiff's comparisons to her treatment under different supervisors does not raise an inference of pretext.

### *(b).*   *Similarly-Situated Co-Workers*

Next, plaintiff suggests defendant's explanation is pretextual because similarly-situated individuals under Rake's supervision were treated differently than her.  A plaintiff may show pretext by proving that similarly situated non-protected individuals were treated more favorably for committing comparable conduct.[79]  "Similarly situated employees are those who deal with

---

[76]*Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000).

[77]*See Watts v. City of Norman*, 270 F.3d 1288, 1293 (10th Cir. 2001).

[78]*See Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1175–76 & n.5 (10th Cir. 2006); *see also Piercy v. Maketa*, 480 F.3d 1192, 1202 (10th Cir. 2007).

[79]*Kendrick*, 220 F.3d at 1232.

the same supervisor and are subject to the same standards governing performance evaluation and discipline."[80]  "In determining whether two employees are similarly situated, a 'court should also compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees.'"[81]  Moreover, similarly-situated persons must have been "disciplined for conduct of 'comparable seriousness' in order for their disparate treatment to be relevant."[82]

Plaintiff's "similarly situated" argument appears to stem from two interrogatories issued to defendant during discovery.  In Interrogatory No. 10, defendant was asked to list all instances of formal and informal discipline initiated by Rake against plaintiff, and in Interrogatory No. 9, defendant was asked to list all verbal or written discipline initiated by Rake and ShanRica Goines against employees other than plaintiff who were under their supervision.  Although defendant identified ninety-four instances of discipline against plaintiff, defendant only identified a total of eighteen instances of discipline against nine other employees.  Plaintiff argues that this discrepancy demonstrates that she was discriminated against.

Defendant, however, argues that plaintiff has not established that these other employees were "similarly situated."  Furthermore, defendant argues that the ninety-four disciplinary actions against plaintiff included both formal and informal discipline, while the eighteen disciplinary actions against other employees under Rake's supervision included only formal discipline (with one informal incident "inadvertently" included).

---

[80]*Rivera v. City & County of Denver*, 365 F.3d 912, 922–23 (10th Cir. 2004) (quoting *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997) (internal quotation marks omitted)).

[81]*McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006) (quoting *Aramburu*, 112 F.3d at 1404).

[82]*Id.* (citing *Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1230 (10th Cir. 2000)).

The Court is unconvinced by defendant's argument. Interrogatory No. 10, regarding plaintiff's discipline, asked for "all instances, verbal and written, informal and formal." Interrogatory No. 9, regarding other employees, asked for "all persons (other than Plaintiff) . . . who were disciplined, either verbally or in writing." Because all formal discipline was administered in writing, the Court concludes that Interrogatory No. 9 was asking for both formal and informal discipline against other employees under Rake's supervision. In fact, when responding to Interrogatory No. 9, ShanRica Goines specifically answered, "ShanRica Goines has no specific recollection of *informal* discipline she issued."[83] The Court draws all reasonable inferences in favor of the plaintiff. Therefore, the Court assumes that Rake's answer to Interrogatory No. 9, regarding employees other than plaintiff, listed *all* instances of discipline, both formal and informal.

Next, defendant argues that any discipline that was initiated against plaintiff prior to 2004 should be barred under the doctrine of claim preclusion. However, even if the Court considers all ninety-four incidents over a seven-year period and views them in the light most favorable to plaintiff, plaintiff has produced no evidence indicating that her discipline was unwarranted, or that her co-workers engaged in similar conduct for which they were treated more favorably.[84]

There is no evidence suggesting the numerical inconsistency in disciplinary incidents between plaintiff and other employees is the result of unequal enforcement of employment

---

[83](Doc. 47, Ex. F, at 11) (emphasis added).

[84]Although plaintiff's Interrogatory No. 9 requested a list of individuals disciplined by Rake, including their names, job titles, and the disciplinary action taken, there is no evidence of what conduct these individuals were punished for. In fact, there is no evidence they engaged in conduct similar to plaintiff's, or that they were *not* punished for engaging in similar conduct. Finally, one of the employees listed in the Interrogatory did not even have the same job title as plaintiff.

policies (such as instructing employees to hold four to six inches of flats).  Plaintiff has not shown that her co-workers engaged in similar "time wasting" practices, or that they had similar unauthorized overtime, or that they failed to follow similar instructions, or that they made similar remarks on the workroom floor, or that, in light of these similarities, they were treated more favorably by Rake.  In fact, plaintiff has not shown that any of the other nine employees were "similarly situated," other than the fact that they were under the same supervisor and were subjected to fewer instances of formal discipline.  The Court cannot conclude that plaintiff's more frequent discipline is evidence that defendant's stated reason for the Notice of Removal was pretextual.  Plaintiff has failed to show–or argue–that her discipline was unwarranted, and she has produced no evidence of causation other than speculation.  "Regardless of an employee's participation in protected activity, he 'may not simply hold [his] employer hostage by proclaiming that any adverse employment decision will be construed as discriminatorily motivated."[85]  Plaintiff has not produced any evidence that Rake's discipline was motivated by a desire to retaliate against plaintiff's EEO activity.

### (c).    Unworthy of Credence

Plaintiff attempts to create a genuine issue of material fact with her own unsupported statements of personal belief.  She suggests that Rake *may* have manipulated Lawson's performance numbers on the computer-generated system to increase Lawson's workload and misrepresent her performance.  However, "a challenge of pretext requires [the court] to look at

---

[85]*Lombardo v. Potter*, 368 F. Supp. 2d 1178, 1195 (D. Kan. 2005) (quoting *Hernandez v. McDonald's Corp.*, 975 F. Supp. 1418, 1427 (D. Kan. 1997)).

the facts as they appear to the person making the [adverse employment] decision."[86] "[I]t is the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of [her] own relative performance."[87] And an employer's mistaken, but good faith belief is not necessarily pretextual.[88] Plaintiff cannot avoid summary judgment with unsupported allegations. Here, defendant has provided copies of plaintiff's DOIS workload and performance on March 23, 2007, and plaintiff has failed to controvert those facts with anything more than unsubstantiated speculation. Based on the record provided, Rake's good faith belief in the accuracy of plaintiff's computer-generated performance records has not been challenged.[89]

Plaintiff repeatedly states that she "felt" targeted and speculates that it was a result of her EEO complaints. However, she has provided no evidentiary support for finding the discipline in this case was unwarranted. Mere belief that discipline is retaliatory is insufficient, by itself, to defeat summary judgment.[90] Plaintiff has not demonstrated that defendant's legitimate, non-discriminatory reasons for issuing the April 21, 2007 Notice of Removal were unworthy of credence or otherwise pretextual. Even if the April 20, 2007 notice was issued a little over two months after plaintiff's February 7, 2007 EEO complaint, plaintiff has shown nothing more than temporal proximity and personal speculation. In fact, the record shows that plaintiff was

---

[86]*Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1179 (10th Cir. 2006) (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000)).

[87]*Id.* (quoting *Furr v. Seagate Tech., Inc.*, 82 F.3d 980, 988 (10th Cir. 1996)).

[88]*Id.* at 1178 (quoting *E.E.O.C. v. Flasher Co.*, 986 F.2d 1312, 1322 n.12 (10th Cir. 1992)).

[89]*See id.* ("Metzler's mere allegation that Miller did not honestly believe her time estimations were reasonable, without any supporting evidence, does not raise a genuine issue of material fact, especially in light of other undisputed evidence in the record.").

[90]*Henry v. Okla. County Bd. of County Comm'rs*, No. 98-6283, 1999 WL 314631, at *2 (10th Cir. May 19, 1999) (citing *Hom v. Squire*, 81 F.3d 969, 974–75 (10th Cir. 1996)).

subjected to informal discipline before she ever filed her first EEO Complaint.[91]  To show

pretext, therefore, an employee must come forward with something more than temporal

proximity.  As one district court noted,

> Disputes concerning the seriousness of various incidents "merely
> question[] the soundness of [a] defendant's judgment." [citation
> omitted]  An employer may develop arbitrary, ridiculous, and even
> irrational policies so long as they are applied in a non-
> discriminatory manner, and retaliation claims do not require or
> authorize a court to engage in examination of the wisdom of an
> employer's judgment in personnel matters.  *See, e.g., McClaughlin
> v. Esselte Pendaflex Corp.*, 50 F.3d 507, 512 (8th Cir. 1995); *Smith
> v. Monsanto Chem. Co.*, 770 F.2d 719, 723 n.3 (8th Cir. 1985).
> Employment laws do not "prohibit employment decisions based on
> . . . factors, such as job performance, erroneous evaluations,
> personality conflicts, or even unsound business practices." [*Rosa-
> Maston v. NME Hosps., Inc.*, 133 F.3d 1104, 1109 (8th Cir.
> 1998).][92]

Even if the Court were to consider all ninety-four instances of "discipline," plaintiff has

not come forward with any evidence to sustain her burden of proof on the pretext issue, *i.e.*, to

show that defendant's proffered reason for her discipline is unworthy of belief.  Because plaintiff

has not established a *prima facie* case of Title VII retaliation and has not come forward with

evidence of pretext, summary judgment is appropriate on this claim.

### C.      Retaliatory Hostile Work Environment

Next, plaintiff claims she was subjected to a retaliatory hostile work environment

because of her EEO activity.  Although it is unclear whether the Tenth Circuit recognizes such a

---

[91]*See Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1314 (6th Cir. 1989) ("the mere fact that
an adverse employment decision occurs after a charge of discrimination is not, standing alone, sufficient to support a
finding that the adverse employment decision was in retaliation to the discrimination claim"); *Lombardo v. Potter*,
368 F. Supp. 2d 1178, 1195 (D. Kan. 2005).

[92]*Poitras v. Glaxo SmithKline Consumer Healthcare, LP*, 635 F. Supp. 2d 1003, 1014 (E.D. Mo. 2009).

claim, this Court will assume, without deciding, that such a claim exists.[93]

In *McGowan v. City of Eufala*,[94] the Tenth Circuit held that, "to succeed on a retaliation claim based on a hostile work environment," "the complained-of harassment must be sufficiently severe to qualify as a materially adverse action under Title VII."[95] "The behavior complained of must render 'the workplace . . . permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"[96] And the harassment must be "in retaliation for engaging in protected activity."[97]

In a retaliation claim, the Tenth Circuit concluded that the harassment must amount to "an 'abusive' materially adverse work environment."[98] Applying *Burlington Northern*, plaintiff need not show that defendant subjected her to "severe or pervasive" harassment, but merely that defendant "subjected [her] to conduct which . . . [was] objectionable enough that it might have dissuaded a reasonable worker from making or supporting a charge of discrimination."[99] "[T]he

---

[93]*See King v. Salazar*, No. CIV 05-0575 JB/WDS, CIV 05-0997 JB/WDS, 2009 WL 1300740, at *9 (D.N.M. Mar. 2, 2009).

[94]472 F.3d 736 (10th Cir. 2006).

[95]*McGowan*, 472 F.3d at 743; *see also Medina v. Income Support Div., N.M.*, 413 F.3d 1131, 1136–37 (10th Cir. 2005) (noting that harassment may be retaliatory if it is sufficiently severe to constitute an adverse employment action).

[96]*McGowan*, 472 F.3d at 743 (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993)).

[97]*King v. Salazar*, 2009 WL 1300740, at *9 (quoting *Noviello v. City of Boston*, 398 F.3d 76, 92 (1st Cir. 2005) (cited in *Lujan v. Johanns*, 181 F. App'x 735, 738 (10th Cir. 2006)).

[98]*Id.*

[99]*Jones v. Wichita State Univ.*, 528 F. Supp. 2d 1182, 1193 n.9 (D. Kan. 2007) (internal quotation marks omitted). In *Jones*, the district court noted that *Burlington Northern* lowered the evidentiary standard in retaliation cases, such that a plaintiff claiming retaliation need not show the employment action was "materially adverse," but merely that the employment action would have been materially adverse "to a reasonable worker," *i.e.*, it would dissuade him from making or supporting a charge of discrimination. *Id.* The district court noted that the standard in

---

alleged retaliatory harassment must be objectively and subjectively offensive, and 'must rise to some level of substantiality.'"[100]  Courts must look at the totality of the circumstances, which includes "the frequency and severity of the harassment, whether it is physically threatening or humiliating, and whether it interferes with an employee's work performance."[101]

Plaintiff claims that she was so emotionally distraught by her work environment that she was "dissuaded from filing" EEO claims, even if she was not "prevented" from filing claims. Plaintiff asks the Court to consider all ninety-four instances of discipline collectively, or the four discrete acts in the aggregate.  Defendant argues the four discrete incidents identified by plaintiff, even when aggregated, do not demonstrate an intentional and retaliatory course of conduct, and plaintiff cannot rely on disciplinary action already addressed by a previous court in *Lawson v. Potter*.[102]

---

a hostile work environment claim might similarly be lowered when the claim is one for retaliation.  Because Jones was asserting that she was subjected to a *retaliatory* hostile work environment, the court noted that she may not need to show "severe and pervasive" harassment–ordinarily required in hostile work environment claims–but merely that the hostility was "objectionable enough that it might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Id.* (quotation marks omitted).  The district court did not apply this lower standard to the facts, but concluded that plaintiff had not met either standard.

Here, plaintiff makes a similar argument.  Relying on Third Circuit precedent, she argues that the standard in *retaliatory* hostile work environment claims is merely a showing that "a reasonable employee would have found the alleged retaliatory actions 'materially adverse.'"  *Hare v. Potter*, 220 F. App'x 120, 132 (3d Cir. 2007) (quoting *Moore v. City of Phila.*, 461 F.3d 331, 341 (3d Cir. 2006)).  However, in *McGowan v. City of Eufala*, 472 F.3d 736 (10th Cir. 2006), the Tenth Circuit did not incorporate the "reasonable person" set out in *Burlington*.  Rather, it held that "to succeed on a retaliation claim based on a hostile work environment," "the complained-of harassment must be sufficiently severe to qualify as a *materially adverse action* under Title VII."  *Id.* at 743 (emphasis added).

This Court applies the "reasonable person" standard to plaintiff's hostile work environment claim above, but still finds that plaintiff has not produced evidence raising a genuine issue of material fact that she was subjected to a retaliatory hostile work environment.

[100]*Lujan v. Johanns*, 181 F. App'x 735, 738 (10th Cir. 2006) (quoting *Noviello v. City of Boston*, 398 F.3d 76, 92 (1st Cir. 2005)).

[101]*Id.*

[102]463 F. Supp. 2d 1270 (D. Kan. 2006).

As discussed above, the Court finds that claim preclusion does not bar plaintiff's present claim for retaliatory hostile work environment. However, even after considering all of plaintiff's formal and informal discipline throughout the 2001–2007 period, this Court cannot conclude that plaintiff has raised a genuine issue of material fact regarding whether the "discipline" was retaliatory, or whether–assuming the discipline *was* retaliatory–it rose to the level of a materially adverse work environment sufficient to dissuade a reasonable employee from making or supporting a charge of discrimination.

Although plaintiff identifies ninety-four instances of "discipline," she has not shown that any single instance of "discipline" was actually "harassment," *i.e.*, abuse motivated by a retaliatory animus; she merely argues that the list of discipline is extensive. Plaintiff encourages the Court to conclude that numerous instances of informal correction *must* be the fault of the employer rather than the employee. However, plaintiff has provided no evidence to support such a conclusion. She has not shown that any particular instance of correction was unprovoked or hostile, that it involved unwarranted discipline, or–most importantly–that it was motivated by retaliatory animus. Defendant asserts the specific interactions in March and May of 2007 were corrective responses to plaintiff's work floor comments and workroom performance. Beyond mere temporal proximity in a few isolated instances, there is no evidence plaintiff's discipline was an intentional, retaliatory response to her EEO activity.[103] Without a showing of some retaliatory motive, plaintiff has not shown causation. Instead, plaintiff admits that some level of

---

[103]*King v. Salazar*, Nos. CI- 05-0575-JB/WDS, CIV-05-0997-JB/WDS, 2009 WL 1300740, at *9 (D.N.M. March 2, 2009) (holding that, even in a claim for retaliatory hostile work environment, plaintiff must still show causation through evidence beyond mere temporal proximity).

discipline was likely warranted;[104] she concedes that Rake never mentioned her EEO activity to her; and plaintiff states that she was never prevented from filing EEO complaints. Plaintiff has not controverted defendant's legitimate, non-discriminatory reasons for plaintiff's discipline.

Finally, there is no evidence the discipline was *abusive* or created a materially adverse work environment. Most of the interactions between Rake and plaintiff were informal and, according to the record, most involved "job discussions" or "job instructions." Under USPS policy, informal discussions or correction are not considered by the employer as a basis for progressively harsher discipline. Plaintiff has not shown that, under the totality of the circumstances, this "discipline" adversely affected her work environment, or would amount to an employment action materially adverse to a reasonable person.[105]

Plaintiff cannot avoid summary judgment with unexplained numbers and mere speculation. "[P]laintiff rests [her] retaliation claim on the fact that [she] has made multiple EEO complaints over the course of [her] employment and on [her] speculative and unsupported assumptions that [her] prior EEO activity was the reason for any decision regarding [her] employment."[106] As plaintiff has produced no evidence to raise a genuine issue of material fact on her claim for retaliatory hostile work environment, the Court finds summary judgment is appropriately granted to defendant.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant's Motion for

---

[104](Doc. 47 at 14.)

[105]*See Medina v. Income Support Div., N.M.*, 413 F.3d 1131, 1137 (10th Cir. 2005) (holding that, because defendant's warning letter was not included in the employee's personnel file and could not be discovered or considered by future employers, it could not adversely affect the terms or conditions of plaintiff's employment).

[106]*Lombardo v. Potter*, 368 F. Supp. 2d 1178, 1195 (D. Kan. 2005).

Summary Judgment (Doc. 44) is granted on plaintiff's claims for retaliation and retaliatory

hostile work environment.

**IT IS SO ORDERED**.

Dated: <u>March 3, 2010</u>

         S/ Julie A. Robinson          
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE